# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| KIMBERLY YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 18-2481-KHV |
| | ) | |
| PHYSICIAN OFFICE PARTNERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On September 7, 2018, Kimberly Young sued Physician Office Partners, Inc., alleging that based on her race, defendant paid her less, retaliated against her for making complaints of race discrimination and terminated her employment.[1]  Complaint For Damages (Doc. #1).  Plaintiff sues under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and 28 U.S.C. § 1981 ("Section 1981").  Pretrial Order (Doc. #54) filed September 27, 2019.  This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #56) filed October 1, 2019.  For reasons stated below, the Court overrules defendant's motion.

## Factual Background

### I.  General Background

Defendant is a healthcare services cycle management company.  Plaintiff is an African-American woman with an associate degree in occupational studies from Vatterott College.  At Vatterott, plaintiff studied medical billing and medical terminology.  Later, she worked for two

---

[1] Plaintiff initially asserted a claim that defendant failed to promote her based on race.  Plaintiff later withdrew that claim.  Plaintiff's Memorandum In Opposition to Defendant's Motion For Summary Judgment (Doc. #61) filed November 1, 2019 at 72 n.20.

years in medical billing and coding for a medical provider.

In August of 2016, defendant established a Quality Assurance Department. That month, a staffing agency (KForce) assigned plaintiff to do medical data entry in defendant's Quality Assurance Department.

In October of 2016, defendant created the positions of Quality Analyst I and Quality Analyst II – both within the Quality Assurance Department. In November of 2016, defendant hired plaintiff to do data entry as a Quality Analyst I. Later that month, the Quality Assurance Department became the "the Quality Reporting Department," and the Quality Analyst I and Quality Analyst II positions became "Abstractor I" and "Abstractor II." Accordingly, plaintiff's job title changed from Quality Analyst I to Abstractor I.

Although the job descriptions listed identical minimum qualifications, Abstractor I and Abstractor II employees initially performed different duties. While Abstractor II employees reviewed medical documentation and abstracted data, Abstractor I employees primarily entered data. Defendant paid Abstractor II employees on a higher scale, and they had a higher earning potential than Abstractor I employees. The starting salaries for both Abstractor I and Abstractor II positions were based on a number of factors, including the applicant's salary as a temporary employee (if applicable), desired salary stated in their application, medical coding experience, ability to analyze medical records and educational background.

During plaintiff's employment, Abstractor I employees were predominantly African-American, while Abstractor II employees were predominantly Caucasian. Specifically, the Quality Reporting Department had seven Abstractor I employees (five African-American and two Caucasian) and ten Abstractor II employees (eight Caucasian, one Hispanic and one African-American). On February 2, 2017, defendant selected Tim Ferris and Jennifer Kraft – two

Caucasian Analysist II employees – for new "Team Lead" positions, leaving eight Abstractor II employees (six Caucasian, one Hispanic and one African-American). As of August of 2017, five of the employees within the Quality Reporting Department were African-American, all of whom were Abstractor I employees and all of whom earned $17 per hour. This rate was the same or higher than all other Abstractor I employees. By contrast, all of the Abstractor II employees were Caucasian with the exception of one Hispanic individual. The Abstractor II employees earned between $18.50 and $20 per hour.

During plaintiff's employment, Lauren Hidaka managed the Quality Reporting Department. In this role, she had the authority to discipline and fire subordinates, but she consulted with the Human Resources and Compliance department ("HR") before administering any discipline. Hidaka's boss was Deb Taylor – the Vice President of HR. Taylor oversaw Hidaka's department, and the two worked closely together.

Defendant was independently owned until 2012, when a company named Envision acquired it. After the purchase, defendant's executive management remained unchanged and it continued to operate separate from Envision. Accordingly, defendant maintained its own employment policies. Under these policies, all abstractors received weekly audits which detailed their performance – good and bad. The audits were designed to measure whether abstractors were meeting the accuracy goal of 96 per cent. The audits were not discipline, but were "discussions" and "purely educational." While defendant did have an objective performance goal – the 96 per cent accuracy rate – departmental managers like Hidaka decided whether and when to discipline an employee for failing to meet this goal. Departmental managers had the discretion to issue verbal or written warnings, and to place an employee on a Performance Improvement Plan ("PIP"). Defendant gave PIPs to help employees improve their performance. A PIP often

contained specific target dates and was available to employees to reference as they attempted to improve their performance. Managers also had discretion to proceed directly to termination for serious misconduct such as threats of violence. At times, Hidaka would use an employee's annual performance review as an opportunity to issue discipline such as a written warning or place an employee on a PIP. Defendant maintained these policies until January 1, 2019, when it adopted Envision's corporate employment policies.

## II. Plaintiff's Performance And Discrimination Charges

In the spring of 2017, the Quality Reporting Department increased production quotas for all employees, who were then expected to review 160 cases per day. Defendant still expected all employees to enter data and/or abstract data at an accuracy rate of 96 per cent. Ferris and Kraft tracked the progress of all abstractors, including their mistakes, and submitted reports to Hidaka. In more than one report, Ferris noted that plaintiff was confused, moved slowly, mistyped information and entered data at an accuracy rate of less than 96 per cent. On October 10, 2017, Hidaka emailed Ferris and Kraft, questioning why plaintiff's productivity was consistently under 100 cases per day. In that email, Hidaka raised similar concerns with respect to another abstractor (Jaclyn Sherrer). In response, Ferris stated that it took a day or two for plaintiff to "switch gears" when she moved from one account to another, and she got confused and "stuck" when she encountered different kind of forms.

On July 11, 2017, plaintiff emailed Hidaka to inquire whether defendant would increase the pay of Abstractor I employees to match that of Abstractor II employees. On July 13, 2017, Hidaka forwarded plaintiff's email to Taylor. Hidaka told Taylor that the Abstractor I employees and Abstractor II employees were essentially doing the same jobs. Specifically, although Abstractor I employees were initially limited to data entry, the entire Quality Reporting

Department was now reviewing medical documentation and abstracting data. Accordingly, each employee in the Quality Reporting Department was effectively an Abstractor II. In response, Taylor asked Hidaka whether everyone would remain an Abstractor II if physician practice management ("PPM") providers made requests on different forms.[2] Hidaka responded that even if PPM providers changed their forms, "maybe one person" would be doing data entry as an Abstractor I employee. Hidaka specified that plaintiff would not be going back to an Abstractor I position.

In response to plaintiff's inquiry, defendant did not increase her compensation or that of other Abstractor I employees. Taylor does not recall looking into the pay disparity between Abstractor I and Abstractor II employees, and she does not recall following up with Hidaka about it. Moreover, Taylor did not have any discussions with plaintiff about her concerns regarding the disparity.

On October 16, 2017, the team lead – Ferris – had an angry outburst in front of plaintiff at work. Plaintiff claims that during their meeting, Ferris lost his cool, shouted at her and pounded his hand on the table. Plaintiff reported to Hidaka that she had feared for her life because she thought that Ferris was going to do something to her. In that regard, plaintiff cited the growing threat of gun violence in the workplace. On October 17, 2017, plaintiff submitted a written summary of the confrontation to Taylor and Lynn Sati, the HR manager. Over several days, Taylor and Sati interviewed plaintiff, Ferris, Hidaka and Kraft. HR then assigned plaintiff to a different Team Lead – Kraft.

---

[2]     Although the record evidence is somewhat unclear on this issue, the number of data entry employees (Abstractor I employees) that defendant needed apparently depended, at least in part, on the kind of request form that PPM providers used.

Around September, October or November of 2017, plaintiff made an internal complaint about racial discrimination to her management team or HR.[3]  On November 2, 2017, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  On November 8, 2017, defendant received notice of plaintiff's EEOC Charge.  Pursuant to defendant's internal policies, employees were supposed to bring complaints of discrimination to HR, which was required to investigate the concerns and document its investigation.  While conducting an investigation, defendant's policies directed HR to gather witness statements and interview the complaining party. In response to plaintiff's charge, HR determined that plaintiff's allegations were unfounded, and it did not interview plaintiff or any other employees in the Quality Reporting Department.

## III.    Plaintiff's Warning and Termination

On November 6, 2017, plaintiff refused to sign her audits, complained that defendant had not adequately trained her and accused her management team of fabricating her audit results.  Later that day, Kraft sent plaintiff a detailed instructional email which contained screen shots of training materials that defendant had provided plaintiff at the beginning of her employment.   Kraft also asserted that plaintiff evidently understood the mistakes that she was making because she had stated that she usually did not make those mistakes.  Plaintiff responded that "no one has ever told me that it was wrong to do, until now, in spite what the training manual is telling you."  Kraft Email (Doc. #56-27).  She then concluded, "I will watch and pay attention moving forward . . ., now that I have been made aware [sic] of the mistake." Id.  Kraft forwarded these emails to Hidaka, stating, "I am at a loss as to how to be any clearer."  Id.  Kraft added, "Showing [plaintiff] the

---

[3]    Beyond complaining of "racial discrimination," the record evidence does not reveal the content of plaintiff's internal complaint.

manual, verbal instructions, and training have not diminished her errant belief that she was never informed of how to perform data entry correctly." Id. Kraft concluded that she was not going to respond any further on this issue unless Hidaka instructed her to do so because "continuing to show evidence contradicting her beliefs will be incendiary and cause a further escalation in her being upset." Id.

On November 10, 2017, Hidaka gave plaintiff her annual performance review. At this time, plaintiff was meeting expectations for accuracy and teamwork, but she fell below expectations for quantity and communication. During the performance review, Hidaka noted that plaintiff needed to increase her productivity to 160 cases per day and "be open to constructive dialog." Employee Performance Appraisal (Doc. #56-22). Although defendant contends that the performance review constituted a PIP, Hidaka did not tell plaintiff that it was a PIP, plaintiff's performance evaluation did not mention a PIP, it did not include a PIP document and it did not identify any specific target dates or follow-up meetings.

Later on November 10, plaintiff emailed Hidaka, asking for a copy of her performance review. Plaintiff also asserted that "maybe you should train your leads to be more professional in their communication as well." Hidaka Email (Doc. #56-28). Plaintiff believed that it was a "really dishonest thing to present just 1 page of an [sic] email conversation and then say that mine [sic] was the only one that was unprofessional." Id. Plaintiff then asserted, "I don't believe for one second that you want me to succeed at my job!" Id. According to plaintiff, "It's not a secret the entire team knows it, you never cared for me, and just now that I have chosen to speak up for myself, now there is a problem . . . now it's I am being unprofessional." Id.

During plaintiff's employment, employees were eligible for merit raises on the anniversary of their hiring. Defendant contends that under its policy, a positive performance review was a

prerequisite for the raise.  In October of 2017, Lisa Roach – a Caucasian Abstractor I – received a dollar-an-hour raise, but did not receive a performance review.  On November 13, 2017, defendant gave a round of annual pay increases, and plaintiff did not receive one.  Plaintiff was the only eligible employee who did not receive an annual increase.

On November 30, 2017, plaintiff believed that Kraft had not adequately assisted her on a specific account, and she emailed Kraft that "I am sick and tired of these attempts to see me fail at doing my work by you and the rest of the staff."  Defendants' Motion For Summary Judgment (Doc. #56-30).  In response, Hidaka scheduled a meeting between the management team and plaintiff.  According to notes that Ferris took during the meeting, plaintiff again accused them of fabricating the audit results.  Ferris' notes also reflect that Hidaka offered plaintiff additional training.  Plaintiff insisted that she wanted defendant to treat her like everyone else in the department – that is, she wanted defendant to answer her questions like it did for everyone else.  Hidaka denied that they treated plaintiff differently.

On December 11, 2017, Hidaka, Ferris and Kraft issued plaintiff a written warning, which Sati and Taylor reviewed and approved.  The reason for the written warning was a combination of plaintiff's audits, productivity goals and "lag" or "idle" time.  Although the form had a place for "previous warnings/discussions," the written warning did not mention that plaintiff had previously received a PIP.  It also did not identify follow-up dates with management, but instead stated that the weekly audits would continue and that plaintiff must improve her productivity and accuracy goals.  In determining whether plaintiff's written warning was fair and justified, Taylor reviewed plaintiff's production reports, but not the production reports of other employees.  Taylor does not know whether other members of management did so, but she believes that someone should have consulted the productivity reports, audit reports, the accuracy and idle time of other employees to

ensure that plaintiff was treated like everyone else. At the time of plaintiff's written warning, ten of her co-workers were averaging less than 160 cases per day. Moreover, four other abstractors were scoring less than 96 per cent in their daily audits, but defendant did not discipline or otherwise punish them.

During the meeting in which plaintiff received the written warning, she accused her management team of giving her a written warning because she had filed an EEOC Charge. Hidaka responded that she was unaware that plaintiff had filed such a charge. According to Ferris' notes of the meeting, plaintiff also accused her management team of fabricating her audit results and refused to review the results or discuss re-training opportunities.

On December 20, 2017, plaintiff emailed Hidaka to ask whether a different Abstractor I employee could work with Jennifer Taylor, one of her co-workers. Hidaka declined plaintiff's request because the department was short on time and staff. Plaintiff responded as follows:

> I have maintained to be professional and to have professional working relationships with my co-workers even when the environment was hostile to me. I never, ever bring to the floor around my coworkers even when the environment is not so professional to me. She is the one who lied on me to you! Am I to assume that you are forcing me to be in a hostile environment or situation! OK! You've been warned!

Young Email (Doc. #56-36). This email made Hidaka feel uncomfortable and threatened, and she immediately forwarded it to HR. Later that day, Sati, Hidaka and Taylor met with plaintiff, who explained that she was "warning" Hidaka that she would go to HR if she had to work in a hostile work environment. During this meeting, Sati, Hidaka and Taylor terminated plaintiff's employment, citing plaintiff's email and her continued performance issues as the reasons for termination.

## IV.    Comparators

### A.    Michelle Klein – Caucasian Abstractor I

On January 31, 2018, Hidaka gave Michelle Klein a verbal warning for not meeting her production quota.  In March of 2018, Hidaka gave Klein her annual performance review, during which Hidaka noted that Klein's performance was below expectations because she was not meeting her production quota.  In conjunction with the annual review, Hidaka also gave Klein a written warning, which Hidaka attached to the performance review as a separate form.  On May 15, 2018, Hidaka issued Klein a final written warning because she had not met her productions goals.  On June 8, 2018, Hidaka terminated Klein's employment.

### B.    Charlene Washington-Curry – African-American Abstractor I

When she began working for defendant, Washington-Curry had seven years of experience in the medical field, which included medical coding.  She started as an Abstractor I employee and earned $17 per hour.

On September 18, 2017, Hidaka gave Washington-Curry her annual performance review, and noted that she was not meeting her production quota and that her accuracy was below 96 per cent.  Hidaka also noted that Washington-Curry's communication skills exceeded expectations.  On January 31, 2018, Hidaka issued Washington-Curry a verbal warning for not meeting her production quota.  On March 2, 2018, Hidaka issued her a written warning for failing to meet her productivity goal.  On March 27, 2018, Hidaka gave Washington-Curry a performance review in which Hidaka noted that she was still not meeting production goals.  Hidaka also noted that Washington-Curry's communication skills were below expectations.

### C.    Denise King – Caucasian Abstractor II

On August 22, 2017, Hidaka placed Denise King on a PIP.  The PIP was on a documented

form, in which Hidaka noted that King needed to review 150 cases per day, and that she would reevaluate King after two weeks, at which time the requirement would increase to 160 cases per day.  On March 27, 2018, Hidaka gave King her performance review, which noted that King was not entering at an accuracy rate of 96 per cent and she was not hitting her minimal case requirement.  Hidaka documented that King's teamwork was unsatisfactory because she was disruptive to team members, inconsiderate and did not utilize offers to help her increase productivity.  King's performance review stated, "Please see Written Warning," and attached a written warning.  The written warning contained a list of previous warnings/discussions, including a date on which King had previously received a PIP, two dates titled "Follow-up to PIP" and a date when King received a verbal warning.  On April 13, 2018, Hidaka issued King a final written warning for not meeting her production quota.  The writing warning listed a specific date for follow-up.  On May 2, 2018, Hidaka terminated King's employment for not meeting her production quota.

### D.      Janice Evans-Osborne – Caucasian Abstractor II

On March 27, 2018, Hidaka noted in a performance review that Evans-Osborn was still not meeting her production quota during her annual performance review, but did meet expectations with respect to communication skills.  The performance review stated, "Please see PIP."  On October 29, 2018, Hidaka placed Evans-Osborne on a PIP, and noted that she needed to reduce her idle time and by November 5, 2018, increase her productivity to review 153 cases per day.  By November 19, 2018, Hidaka expected her to reach 170 cases per day.

### E.      Amber Justus – Caucasian Abstractor II

On March 23, 2018, Hidaka noted that Justus' productivity and communication skills were below expectations and placed her on a PIP, which she attached to the performance evaluation.

**F.  Jaclyn Sherrer – African-American Abstractor II**

On March 27, 2018, Hidaka gave Sherrer her annual performance review, which noted that Sherrer's productivity was below expectations, but that her communication skills met expectations.

**G.  Doris O'Reilly – Caucasian Abstractor II**

When she began working for defendant, O'Reilly had a high school education and had worked over five years in the medical field, where she had some experience with the documents and other requirements for insurance coverage.  She started as an Abstractor II employee and earned $19 per hour.

In October of 2017, O'Reilly missed her productivity goal every day for two weeks.  She did not receive any discipline.

**H.  Jennifer Kraft – Caucasian Abstractor II and Later "Team Lead"**

When she began working for defendant, Kraft had a bachelor's degree in healthcare and had worked less than five years in the medical field, during which she had some experience with coding.  She started as an Abstractor II employee and earned $20 per hour.

**I.  Takala Johnson – African-American Abstractor II**

When she began working for defendant, Johnson had a medical coding degree, and had worked in the medical field for over seven years, where she had experience with billing and coding. She started as an Abstractor II employee and earned $18.50 per hour.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry their burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, parties cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

<u>**Analysis**</u>

Plaintiff alleges that based on her race, defendant subjected her to disparate treatment, retaliated against her for reporting race discrimination and terminated her employment. <u>Pretrial Order</u> (Doc. #54). Specifically, plaintiff asserts the following claims: (1) under Title VII and Section 1981, termination based on race; (2) under Title VII and Section 1981, disparate treatment in compensation; and (3) under Title VII and Section 1981, retaliation for reporting racial discrimination. <u>Id.</u> Defendant seeks summary judgment on all claims.

**I.      Race Discrimination**

Plaintiff asserts race discrimination claims for disparate compensation and termination of employment under both Title VII and Section 1981. Specifically, plaintiff alleges that based on race, defendant (1) subjected her to disparate treatment in compensation and (2) terminated her employment. Defendant asserts that as a matter of law, these claims must fail.

**A.      Pay Discrimination**

Plaintiff asserts that in violation Title VII and Section 1981, defendant discriminated against her in compensation. Specifically, plaintiff first asserts that based on race, defendant paid her less than Abstractor II employees – who were all Caucasian with the exception of one Hispanic individual – despite the fact that they performed the same job. Moreover, plaintiff asserts that because of race, she was the only eligible employee who did not receive an annual pay raise. Defendant seeks summary judgment on each of plaintiff's claims.

To succeed on claims of pay discrimination,[4] plaintiff can either provide direct evidence of discrimination, or follow the burden-shifting framework that the Supreme Court established in

---

[4]      For racial discrimination claims brought under Title VII and Section 1981, the Court applies the same <u>McDonnell Douglas</u> framework. <u>See</u> <u>Clay v. United Parcel Serv., Inc.</u>, 983 F. Supp. 2d 1331, 1339 (D. Kan. 2013).

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Khalik v. United Air Lines, 671 F.3d 1188, 1192 (10th Cir. 2012).  Under the McDonnell Douglas framework, plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  Once plaintiff establishes a prima case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the disparate compensation.  Id.  If defendant does so, plaintiff must show that defendant's reason was pretextual.  Id.

Here, defendant asserts that it is entitled to summary judgment on plaintiff's claims for pay discrimination because (1) she has not established a prima facie case of discrimination, (2) it had legitimate, nondiscriminatory reasons for the pay disparities in question and (3) those reasons were not pretextual.

### 1.      Prima Facie Case

Defendant asserts that it is entitled to summary judgment because plaintiff has not established a prima facie case of pay discrimination.

To establish a prima facie case for a disparate treatment claim, plaintiff must show that (1) she belongs to a protected class, (2) she suffered an adverse employment action and (3) the action took place under circumstances which give rise to an inference of discrimination.  Moore-Stovall v. Shinseki, 969 F. Supp. 2d 1309, 1322 (D. Kan. 2013).  Courts have identified a variety of circumstances that can give rise to an inference of discrimination, including preferential treatment of employees outside of the protected class.  Id.  Accordingly, for purposes of a racial pay discrimination claim, plaintiff can satisfy this standard by showing that she was paid less, or given a lesser pay raise, than similarly-situated employees of different races.  Taher v. Wichita State Univ., 526 F. Supp. 2d 1203, 1218 (D. Kan. 2007); Lewis v. D.R. Horton, Inc., 375 F. App'x 818, 825 (10th Cir. 2010) ("a prima facie showing of discrimination consists of evidence that a

female employee occupies job similar to that of higher paid males."); Moore-Stovall, 969 F. Supp. at 1322 (receiving lower raise than similarly-situated employees is adverse employment action). Whether employees are similarly situated – that is, whether they are "similar in all material respects" – is a fact-intensive inquiry, and what facts are material will vary depending on the case. Lucero v. Sandia Corp., 495 F. App'x 903, 909 (10th Cir. 2012).

Here, plaintiff asserts that (1) she was paid less than Caucasian employees who were doing the same job and (2) she was the only eligible employee who did not receive an annual merit raise on November 13, 2017. Defendant asserts that neither of these claims gives rise to an inference of discrimination.

### i.    Pay Disparity

Plaintiff claims that despite performing the same work, defendant paid her less than Caucasian Abstractor II employees. Defendant asserts that the pay disparity between Abstractor I and Abstractor II employees does not give rise to an inference of discrimination because it paid plaintiff the same as the other Abstractor I employees.[5]

This argument misses the point. The record shows that defendant paid plaintiff less than Caucasian employees who were performing the same job. Specifically, as of August of 2017, five of the employees within the Quality Reporting Department were African-American, all of whom were Abstractor I employees and all of whom earned $17 per hour. By contrast, all of the Abstractor II's were Caucasian with the exception of one Hispanic individual, and they earned

---

[5]    Defendant also argues that even though Abstractor II employees (who were all Caucasian with the exception of one Hispanic) earned more than Abstractor I employees (which was the position held by every African-American in the Quality Reporting Department), defendant filled those positions based on experience and credentials – not race. This is effectively an argument that defendant had legitimate, nondiscriminatory reasons for the pay disparity. The Court addresses that argument below.

between $18.50 and $20 per hour. Despite this pay disparity, the evidence shows that as early as July of 2017, Abstractor I and Abstractor II employees were effectively performing the same job. Indeed, Hidaka told Taylor exactly this on July 13, 2017 after plaintiff had inquired whether defendant would increase the salaries of Abstractor I employees. Specifically, Hidaka told Taylor that although Abstractor I employees were initially limited to data entry, the entire Quality Reporting Department was now reviewing medical documentation and abstracting data, which is what Abstractor II employees did. Accordingly, each employee in the Quality Reporting Department was essentially an Abstractor II employee. This included plaintiff, who Hidaka explicitly identified as an employee who would not return data entry work but instead would effectively remain an Abstractor II employee.

Accordingly, contrary to defendant's assertion, it does not matter that plaintiff earned the same amount as the other Abstractor I employees. The evidence shows that defendant paid plaintiff less even though she performed the same job as the Caucasian Abstractor II employees. To this extent, the formal label that defendant placed on its employees – whether "Abstractor I" or "Abstractor II" – is meaningless for purposes of a pay discrimination claim if all of the employees were performing the same job. This evidence creates a genuine issue of material fact whether plaintiff has established a prima case of pay discrimination.

### ii.  Pay Increase

Plaintiff claims that defendant denied her annual pay increase because of race. Defendant asserts that its rejection of plaintiff's merit raise does not give rise to an inference of discrimination because a prerequisite for such a raise was a positive performance review, which plaintiff did not receive.

The record creates a genuine issue of material fact whether defendant's denial of plaintiff's annual merit raise gives rise to an inference of discrimination. The record contains evidence that defendant did not uniformly apply its policy that a positive performance review was a prerequisite for an annual merit raise. Specifically, in October of 2017, Lisa Rocha – a Caucasian Abstractor I employee – received a dollar-an-hour raise even though she did not receive a performance review. By contrast, on November 13, 2017, plaintiff was the only eligible employee who did not receive an annual increase. A reasonable factfinder could conclude that this evidence gives rise to an inference of discrimination.

### 2. Legitimate, Nondiscriminatory Reasons

Defendant asserts that it had legitimate, nondiscriminatory reasons for the pay disparities in question. With respect to the pay disparities between plaintiff and Caucasian Abstractor II employees, defendant asserts that it based its compensation on objective factors such as experience in the healthcare industry, ability to analyze medical records, medical coding proficiency and educational background. With respect to its rejection of plaintiff's pay increase, defendant asserts that it only gave annual merit raises to employees who received positive performance reviews. Because plaintiff received a negative annual performance review on November 10, 2017, she did not receive a merit raise three days later. Plaintiff does not contest that if true, these are legitimate, nondiscriminatory reasons for both the pay disparity and the rejection of her raise. Defendant has satisfied its burden on this issue.

### 3. Pretext

Defendant asserts that it is entitled to summary judgment because its nondiscriminatory reasons for paying plaintiff less than Caucasian Abstractor II employees and rejecting plaintiff's pay increase were not pretextual.

As the Court explained above, once defendant proffers legitimate, nondiscriminatory reasons for their actions, plaintiff must show that those reasons were pretextual. <u>Khalik</u>, 671 at 1192. To determine whether defendant's reasons for disparate compensation were pretextual, the Court's inquiry is not whether the reasons were "wise, fair or correct," but instead whether defendant "honestly believed those reasons and acted in good faith upon those beliefs." <u>Rivera v. City & Cnty. of Denver</u>, 365 F.3d 912, 925 (10th Cir. 2004) (citation and quotations omitted). To prove that defendant did not do so, plaintiff can demonstrate that defendant's proffered explanations are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder would conclude they are unworthy of belief." <u>Williams v. FedEx Corp. Servs.</u>, 849 F.3d 889, 900 (10th Cir. 2017). Plaintiff can also show that defendant treated plaintiff differently than similarly-situated employees. <u>Crowe v. ADT Sec. Servs., Inc.</u>, 649 F.3d 1189, 1196 (10th Cir. 2011).

Here, the record creates genuine issues of material fact whether defendant's proffered reasons for the pay disparities in question were pretextual for race discrimination. With respect to the pay disparities between plaintiff and the Caucasian Abstractor II employees, defendant asserts that it based its compensation on objective factors that are relevant to the medical coding industry. The evidence shows, however, that defendant did not always apply these factors equally. For example, Washington-Curry (African-American Abstractor I employee) and Johnson (African-American Abstractor II employee) both had more experience in the medical industry – including in medical coding – than Kraft and O'Reilly (both Caucasian Abstractor II employees). Defendant, however, paid Washington-Curry ($17) and Johnson ($18.50) less per hour than Kraft ($20) and O'Reilly ($19).

Even if the evidence showed that defendant consistently evaluated experience when assigning compensation, the evidence still shows a considerable racial disparity in compensation

between employees who were doing the same job. Specifically, all of the African-American employees in the Quality Reporting Department were performing the same work as all of the Caucasian employees, but the African-American employees were earning less. As of August of 2017, five of the employees within the Quality Reporting Department were African-American, all of whom were Abstractor I employees and all of whom earned $17 per hour. By contrast, all of the Abstractor II's were Caucasian with the exception of one Hispanic individual, and they earned between $18.50 and $20 per hour. Despite this pay disparity, the evidence shows that as early as July of 2017, Abstractor I and Abstractor II employees were effectively performing the same job. Indeed, Hidaka told Taylor exactly this on July 13, 2017 after plaintiff had inquired whether defendant would increase the salaries of Abstractor I employees. Specifically, Hidaka told Taylor that although Abstractor I employees were initially limited to data entry, the entire Quality Reporting Department was now reviewing medical documentation and abstracting data, which is what Abstractor II employees did. Accordingly, each employee in the Quality Reporting Department was essentially an Abstractor II employee. Despite receiving notice of this pay disparity, defendant did not increase plaintiff's compensation. Indeed, Taylor does not recall investigating the disparity or following up with Hidaka about plaintiff's request. Combined with the evidence that defendant did not consistently evaluate experience when assigning compensation, a reasonable jury could find that defendant's proffered reason for the pay disparity between plaintiff and Caucasian Abstractor II employees was pretextual for race discrimination. See Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1315 (10th Cir. 2006) (because male employees received "substantially larger salary for performing identical work," reasonable jury could find defendant's explanation that male employees had more experience was pretextual for sex discrimination). The Court therefore overrules defendant's objection on this issue.

### ii.    Pay Increase

The record also creates a genuine issue of material fact with respect to defendant's rejection of plaintiff's merit pay raise.  Defendant asserts that it declined plaintiff's annual raise because a prerequisite was a positive performance review, which she did not receive.  As the Court explained above, however, defendant did not uniformly apply this policy.   Specifically, in October of 2017, Lisa Rocha – a Caucasian Abstractor I employee – received a dollar-an-hour raise even though she did not receive a performance review.  Combined with evidence regarding the racial pay disparities between plaintiff and Caucasian employees performing the same job, a reasonable jury could find that plaintiff's negative performance review was a pretextual reason to deny her annual raise on November 13, 2017.  The Court therefore overrules defendant's motion on this issue.

### B.    Termination

Defendant seeks summary judgment on plaintiff's claims that based on race, defendant terminated her employment in violation of Title VII and Section 1981.

To succeed on these discriminatory discharge claims,[6] plaintiff can either provide direct evidence of discrimination, or follow the McDonnell Douglas burden-shifting framework.  Khalik, 671 F.3d at 1192.  Under the McDonnell Douglas framework, plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  Once plaintiff establishes a prima case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the termination. Id.  If defendant does so, plaintiff must show that defendant's reason was pretextual.  Id.

---

[6]        In racial discrimination suits brought under Title VII and Section 1981, the elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas.  See Clay v. United Parcel Serv., Inc., 983 F. Supp. 2d 1331, 1339 (D. Kan. 2013).

Here, defendant asserts that it is entitled to summary judgment on plaintiff's claims because (1) she has not established a prima facie case of discrimination, (2) it had legitimate, nondiscriminatory reasons for terminating her employment and (3) those reasons were not pretextual.

## 1. Prima Facie Case

Defendant asserts that it is entitled to summary judgment because plaintiff has not established a prima facie case of discrimination.

To establish a prima facie case of discrimination, plaintiff must show that defendant's adverse employment action (terminating her employment) "give[s] rise to an inference of unlawful discrimination." Barlow v. C.R. England, Inc., 703 F.3d 497, 505 (10th Cir. 2012). To do so, plaintiff must demonstrate that (1) she was a member of a protected class, (2) she was qualified and satisfactorily performing her job and (3) defendant terminated her employment under circumstances giving rise to an inference of discrimination, such as "actions or remarks made by decisionmakers," "preferential treatment given to employees outside the protected class," or "more generally, [ ] the timing or sequence of events leading to plaintiff's termination." Id. (citations omitted).

Here, defendant focuses on the first prong, asserting that plaintiff was not satisfactorily performing her job. Specifically, defendant argues that plaintiff moved slowly, was easily confused and misread critical information. As a result, it argues that she could not meet her production quota, and this struggle continued despite management providing her detailed instructional materials. To make matters worse, according to defendant, plaintiff rejected the managers' offers to help, and instead accused them of fabricating audit results. Defendant claims

that the relationship came to a breaking point when plaintiff sent Hidaka a "threatening" email which notified her of what plaintiff perceived to be a hostile work environment.

Plaintiff responds that she was satisfactorily performing her job, but that because of race, defendant held her to higher standards. In other words, she performed just as well as – if not better than – her Caucasian counterparts, but defendant scrutinized and criticized her work to a greater extent.

The record creates a genuine issue of material fact whether plaintiff was performing satisfactorily when defendant terminated her employment. At the time of plaintiff's written warning, ten similarly-situated coworkers were averaging less than 160 cases per day. In terms of quality of work, four other abstractors were scoring less than 96 per cent in their audits. Defendant did not discipline or otherwise punish any of these employees. In other words, despite the fact that these employees were performing similarly to or even worse than plaintiff, defendant singled out plaintiff's work as unsatisfactory. Because defendant did not do the same for the other employees, a reasonable factfinder could conclude that defendant did not actually find plaintiff's work unsatisfactory. Evidence that plaintiff accused her managers of fabricating audits and that she notified Hidaka about what she perceived to be a hostile work environment does not compel a different conclusion. In both instances, plaintiff was asserting that defendant was treating her differently than other employees, whether by adjusting results to make her work appear unsatisfactory or refusing her requests to work with different colleagues. Defendants offer no support for the proposition that as a matter of law, these actions made plaintiff's job performance unsatisfactory. The Court overrules defendant's motion on this issue.[7]

---

[7]    In its reply to plaintiff's response, defendant for the first time challenges plaintiff's prima facie case under the third prong, arguing that the record evidence does not establish an

(continued…)

## 2.    Legitimate, Nondiscriminatory Reasons

Defendant asserts that it is entitled to summary judgment because it had legitimate, nondiscriminatory reasons for terminating plaintiff's employment.  As the Court explained above, once plaintiff establishes a prima case of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for termination.  Khalik, 671 at 1192.

Here, defendant asserts that it terminated plaintiff's employment because plaintiff was "outwardly and verbally resistant to any constructive feedback from her management team." Defendant's Memorandum Of Law Supporting Its Motion For Summary Judgment (Doc. #56-1). Specifically, rather than taking responsibility for her mistakes or accepting offers for additional training, plaintiff "sent unprofessional and confrontational emails, refused to participate in meetings, and became disruptive to other employees." Id.  According to defendant, the "last straw" was when plaintiff warned Hidaka about the hostile work environment, which Hidaka took as a "direct threat." Id.  In passing, defendant also asserts that because of these actions "and continuing performance issues," it terminated plaintiff's employment.  Plaintiff does not contest that if true, these are legitimate, nondiscriminatory reasons for discharging an employee.  Defendant has satisfied its burden on this issue.

---

[7](…continued)
inference of discrimination.  See Defendant's Reply In Support Of Its Motion For Summary Judgment (Doc. #64) filed November 22, 2019 at 82 ("Even assuming, arguendo, that [plaintiff] was performing her job satisfactorily, she cannot prove that she was criticized more than were similarly situated Caucasian coworkers.").  Because defendant did not raise this argument in its opening memorandum, the Court does not address it.  Green v. New Mexico, 420 F.3d 1189, 1196–97 (10th Cir.2005) ("Generally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply."); Minshall v. McGraw Hill Broad. Co., 323 F.3d 1273, 1288 (10th Cir. 2003) (argument raised for the first time in reply brief is waived).

### 3.    Pretext

Defendant asserts that it is entitled to summary judgment because its legitimate, nondiscriminatory reasons for terminating plaintiff's employment were not pretextual.

As the Court explained above, once defendant proffers legitimate, nondiscriminatory reasons for discharging her, plaintiff must show that those reasons were pretextual. Khalik, 671 at 1192. To determine whether defendant's were pretextual, the Court's inquiry is not whether the reasons were "wise, fair or correct," but instead whether defendant "honestly believed those reasons and acted in good faith upon those beliefs." Rivera, 365 F.3d at 925 (citation and quotations omitted). To prove that defendant did not do so, plaintiff can demonstrate that defendant's proffered explanations are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder would conclude they are unworthy of belief." Williams, 849 F.3d at 900. Plaintiff can also show that defendant treated plaintiff differently than similarly-situated employees. Crowe, 649 F.3d at 1196.

Here, the record evidence creates a genuine issue of material fact whether defendant's legitimate, nondiscriminatory reasons for terminating plaintiff's employment were pretextual.

### i.    Plaintiff's Performance

A reasonable factfinder could find that defendant's explanation for terminating plaintiff's employment was a pretext for race discrimination. To establish that it fired plaintiff because of poor performance, defendant repeats the same argument from above: that plaintiff moved slowly, was easily confused and misread critical information. As a result, she could not meet her production quota, and this struggle continued despite management providing detailed instructional materials. Plaintiff responds that she was satisfactorily performing her job, but that because of race, defendant held her to higher standards. In other words, she performed just as well as – if not

better than – Caucasian counterparts, but defendant scrutinized her work to a greater extent and disciplined her more harshly.

The record evidence creates a genuine issue of material fact whether defendant used plaintiff's performance as pretext to terminate her employment because of race. The Court's prior discussion about plaintiff's performance also applies here: a reasonable factfinder could conclude that plaintiff's work was not unsatisfactory to defendant. Specifically, at the time of plaintiff's written warning, ten similarly-situated coworkers were averaging less than 160 cases per day. In terms of quality of work, four other abstractors were scoring less than 96 per cent in their audits. Unlike with plaintiff, defendant did not discipline or otherwise punish any of these employees. In other words, even though these employees were performing similarly to or even worse than plaintiff, defendant singled out plaintiff's work as unsatisfactory. As the Court explained above, a reasonable factfinder could conclude based on this evidence that defendant did not find plaintiff's work unsatisfactory, and that its stated reason for termination was pretextual.

In addition to showing that its stated reason for termination was a pretext, the record supplies other evidence that race was the real reason. Specifically, the record evidence shows that defendant subjected plaintiff to harsher discipline sooner and offered fewer opportunities for improvement than it provided to similarly-situated Caucasian employees. With respect to these Caucasian employees (King, Evans-Osborn and Klein),[8] the evidence establishes the following:

> King: In August of 2017, King received a PIP, which was on a documented form that contained specific goals with targeted dates for improvement. On March 27, 2017, her performance review noted that she was still not hitting minimal case requirements, that her teamwork was unsatisfactory because she was disruptive to team members, inconsiderate and did not utilize offers to help her increase productivity. The performance review said "Please see Written Warning," and a written warning was attached. Moreover, the written warning contained a list of previous warnings/discussions, including a date on which King

---

[8]    Defendant concedes that King, Evans-Osborn and Klein are similarly situated to plaintiff.

had previously received a PIP, two dates titled "Follow-up to PIP" and a date when received a verbal warning. On April 13, 2018, Hidaka issued King a final written warning for not meeting her production quota. The writing warning also listed a specific date for follow-up. On May 2, 2018, Hidaka terminated King's employment for not meeting her production quota.

Evans-Osborn: On March 27, 2018, Hidaka noted in a performance review that Evans-Osborn was still not meeting her production quota during her annual performance review, but did meet expectations with respect to communication skills. The performance review stated, "Please see PIP." On October 29, 2018, Hidaka placed Janice Evans-Osborne on a PIP, and noted that Evans-Osborne needed to reduce her idle time and by November 5, 2018, increase her productivity to review 153 cases per day. By November 19, 2018, Hidaka expected her to reach 170 cases per day.

Klein: On January 31, 2018, Hidaka gave Michelle Klein a verbal warning for not meeting her production quota. In March of 2018, Hidaka gave Klein her annual performance review, during which Hidaka noted that Klein's performance was below expectations because Klein was not meeting her production quota. In conjunction with the annual review, Hidaka also gave Klein a written warning, which Hidaka attached to the performance review as a separate form. On May 15, 2018, Hidaka issued Klein a final written warning because she had not met her productions goals. On June 8, 2018, Hidaka terminated Klein's employment.

This evidence shows that after their poor performance, King, Evans-Osborn and Klein received gradual discipline which included multiple warnings, specific goals for improvement and documented follow-up dates. By contrast, defendant gave plaintiff just one written warning before terminating her employment nine days later. Prior to her written warning, plaintiff had not received a verbal warning, a PIP, a final warning or any variation of the three. Although defendant contends that it considered plaintiff's performance review of November 10, 2017 to be a PIP, Hidaka did not tell plaintiff that it was a PIP, plaintiff's performance evaluation did not mention a PIP, it did not include a PIP document and it did not identify any specific target dates or follow up meetings – all common characteristics of a true PIP. The one warning that plaintiff did receive on December 11, 2017 omitted any particular dates for follow-up, and instead merely stated that the weekly audits would continue, and that plaintiff must improve her productivity and accuracy goals. Defendant fired plaintiff nine days later. This contrasts with King, Evans-Osborn and Klein, who

received between four and eight months to improve.[9]   This evidence shows that defendant disciplined plaintiff differently than similarly-situated Caucasian employees.  Combined with the evidence that defendant did not actually find plaintiff's work unsatisfactory, a reasonable jury could conclude that plaintiff's performance was a pretextual reason to fire her based on race.

### ii.      Constructive Criticism And Plaintiff's "Threat"

Second, a reasonable factfinder could find as pretextual defendant's explanation that it fired plaintiff because she was "outwardly and verbally resistant to any constructive feedback from her management team" and because she "threatened" Hidaka.  Defendant's Memorandum Of Law Supporting Its Motion For Summary Judgment (Doc. #56-1).  Defendant's characterization of plaintiff's conduct is exaggerated and does not entitle it to judgment as a matter of law.

On October 16, 2017, Ferris violently yelled at plaintiff and pounded his hands on the table.  Plaintiff reported to Hidaka that she feared for her life, particularly in light of the growing problem of gun violence in the workplace.  On December 20, 2017, after Hidaka denied her request to not work with a certain co-worker, plaintiff emailed Hidaka: "Am I to assume that you are forcing me

---

[9]      Defendant contends that plaintiff did not receive the same discipline process as King, Evans-Osborn and Klein because its performance review policy changed in early 2018 when it adopted Envision's policies.  According to defendant, Envision's policies – which led to different management expectations – were in place when it disciplined King, Evans-Osborn and Klein in 2018, but not when it disciplined plaintiff in December of 2017.  Defendant did not include this fact in its original motion, and instead adds it in response to plaintiff's statement of facts.  The Court therefore does not consider this fact.  See Green v. New Mexico, 420 F.3d 1189, 1196 (10th Cir. 2005) (nonmoving party should have opportunity to respond to new material – including new evidence – raised for first time in movants reply).  Not only did defendant not include this fact in its original motion, it actually included facts that contradict it.  See DSOF 3 ("In fact, [defendant] maintained separate and distinct employment policies from Envision until approximately January 1, 2019."); see also DSOF 5 ("POP continued to operate independently of Envision until January 2017. At that time, Envision became more involved in the day-to-day operations of POP's various departments. However, POP did not adopt Envision's employment policies and/or practices.").

to be in a hostile environment or situation! OK! You've been warned!"  Because plaintiff had referenced gun violence in the workplace on October 16, 2017, defendant claims that Hidaka perceived this as a threat to her life.  A reasonable jury could easily conclude otherwise, and find that defendant misconstrued or profoundly exaggerated plaintiff's comments, then used the incident as pretext to terminate plaintiff's employment based on race.[10]

The same is true with respect to the other incidents that defendant identifies.  Although somewhat unclear, defendant apparently refers to three in particular:

> (1) <u>November 6, 2017</u>: In response to her weekly audit, plaintiff complained that her results were the consequences of defendant's inadequate training, and accused her management team of altering the results.  Later that day, Kraft sent plaintiff a detailed instructional email which contained screen shots of training materials.  In response, plaintiff explained this was the first time that anyone had notified her of this mistake, and she assured Kraft that she "will watch and pay attention moving forward . . ., now that I have been made aware [sic] of the mistake."

> (2) <u>November 10, 2017</u>: Hidaka told plaintiff during her annual performance review that she needed to "be open to constructive dialogue."  Later that day, while asking for a copy of her performance review, plaintiff requested that defendant reciprocate the "constructive dialogue."  Specifically, plaintiff suggested that Hidaka train her leads "to be more professional in their communication as well," and that it was "really dishonest" to only characterize her communication as unprofessional.  Plaintiff concluded it was "not a secret" that Hidaka did not like her, and that Hidaka was only accusing her of being unprofessional now that she was standing up for herself.

---

[10]     Defendant cites two cases in which the Tenth Circuit affirmed the district court's holding that as a matter of law, an employer's proffered reason for termination was not pretext where it fired plaintiff because other coworkers had reported that plaintiff had threatened or assaulted them.  See McNeil v. Kennecott Holdings, 381 F. App'x 791, 795 (10th Cir. 2010) (no pretext where employer believed coworkers reports that plaintiff had threatened them); see also McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) (plaintiff failed to establish pretext where employer believed in good faith allegations that plaintiff had sexually assaulted employee, even if belief later proved erroneous).  These cases do not compel a different conclusion here.  In each case, the Tenth Circuit found that the record evidence was insufficient to show that the employer acted in bad faith.  In other words, the evidence established that the employer actually believed the coworker's allegations, and fired plaintiff for that reason.  That is not the case here.  For the reasons the Court explained above, a reasonable jury could find that defendant did not actually believe that plaintiff had "threatened" Hidaka.  Accordingly, the record evidence creates a genuine issue of material fact whether this alleged threat was a pretextual reason for plaintiff's termination.

(3) <u>November 30, 2017</u>: After Kraft had failed to assist her on a specific account, plaintiff emailed Kraft that she was "sick and tired of these attempts to see me fail." In the ensuing meeting, Ferris' notes state that plaintiff again accused management of fabricating audit results, and she insisted that she wanted defendant to treat her like everyone else.

These incidents do not conclusively establish that plaintiff was "outwardly and verbally resistant to any constructive feedback," that she "refused to participate in meetings" or that she "became disruptive to other employees." Indeed, the encounter with Kraft on November 6, 2017 ended with plaintiff acknowledging the mistake that she had been making and assuring that she would avoid the mistake in the future. In the other two incidents, plaintiff insisted that her managers reciprocate the respect that they were demanding from her and treat her the same as her coworkers. Particularly against the backdrop of the lesser discipline that defendant applied to similarly-performing Caucasian employees, a reasonable factfinder could find that defendant used these incidents as pretext to terminate plaintiff's employment based on race. The Court therefore overrules defendant's motion on this issue.

## II.    Retaliation

Plaintiff asserts retaliation claims under Title VII and Section 1981. Specifically, plaintiff alleges that because she made good faith complaints of race discrimination, defendant gave her an unsatisfactory performance review and written warning, did not give her an annual pay increase and later terminated her employment. Defendant asserts that these claims fail as a matter of law.

To succeed on a retaliation claim under Title VII or Section 1981,[11] plaintiff must show that defendant retaliated against her for engaging in protected activity. <u>Thomas</u>, 803 F.3d at 514. To do so, plaintiff can either provide direct evidence of retaliation, or follow the <u>McDonnell</u>

---

[11]    The Court analyzes both Title VII and Section 1981 retaliation claims under the same <u>McDonnell Douglas</u> framework. <u>Thomas v. Berry Plastics Corp.</u>, 803 F.3d 510, 514 (10th Cir. 2015).

<u>Douglas</u> burden-shifting framework.  <u>Id.</u>  Under the <u>McDonnell Douglas</u> framework, plaintiff has the initial burden of establishing a prima facie case of retaliation.  <u>Id.</u>  Once plaintiff establishes a prima case, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  <u>Id.</u> If defendant does so, plaintiff must show that defendant's reason was pretextual.  <u>Id.</u>

Here, defendant asserts that it is entitled to summary judgment on plaintiff's retaliation claims because (1) she has not established a prima facie case of retaliation, (2) it had legitimate, non-retaliatory reasons for the adverse employment actions and (3) those reasons were not pretextual.

## A.    Prima Facie Case

Defendant asserts that it is entitled to summary judgment because plaintiff has not established a prima facie case of retaliation.

To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected activity, (2) she suffered a material adverse action and (3) "there was a causal connection between the protected activity and the adverse action."  <u>Id.</u>  Here, defendant does not contest that plaintiff engaged in protected activity when she made a Charge of Discrimination with the EEOC,[12] but instead limits its challenge to the latter two prongs.

### 1.    Material Adverse Action

Plaintiff alleges that because she filed a Charge of Discrimination with the EEOC,

_____

[12]    For purposes of the "protected activity" prong, defendant argues that the record does not contain evidence that plaintiff made internal complaints of racial discrimination.  In response to defendant's summary judgment motion, plaintiff focuses exclusively on its Charge of Discrimination with the EEOC, and does not mention the claims that she allegedly made in September, October or November of 2017.  Accordingly, for purposes of summary judgment, plaintiff apparently abandons any claim based on the internal complaints.

defendant gave her an unsatisfactory performance review and a written warning, did not give her an annual pay increase and later terminated her employment. Defendant asserts that the unsatisfactory performance review and written warning do not constitute an adverse employment action for purposes of Title VII and Section 1981.

Title VII and Section 1981 protect an individual "not from all retaliation, but from retaliation that produces an injury or harm." Sotunde v. Safeway, Inc., 716 F. App'x 758, 767 (10th Cir. 2017). Accordingly, an action must be "materially adverse," which means that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id.

Here, the record evidence creates a genuine issue of material fact whether plaintiff's negative performance review of November 10, 2017 and written warning of December 11, 2017 constituted adverse employment actions. Specifically, a reasonable jury could find that both the performance review and written warning would have dissuaded a reasonable worker from making or supporting a charge of discrimination. On November 10, 2017, Hidaka gave plaintiff a negative annual performance review, explaining that plaintiff fell below expectations in terms of quantity and communication. During the performance review, Hidaka noted that plaintiff needed to increase her productivity to 160 cases per day and "be open to constructive dialog." On November 13, 2017, plaintiff was the only employee not to receive an annual increase because of her negative performance review.[13] On December 11, 2017, Hidaka, Ferris and Kraft issued plaintiff a written warning because of a combination of plaintiff's audits, productivity goals and

---

[13] Defendant concedes this point, asserting that "[w]hile being placed on a PIP during her annual performance review prevented [plaintiff] from receiving a merit raise, it did not reduce her salary." Defendants' Motion For Summary Judgment (Doc. #56-1) at 35.

"lag" or "idle" time. On December 20, 2017, defendant terminated plaintiff's employment and cited, among other reasons, plaintiff's continued performance issues. In other words, defendant refused to increase plaintiff's pay and terminated her employment based on the poor performance that it had identified in her performance review and written warning. Accordingly, a reasonable jury could find that the performance review and written warning would have dissuaded a reasonable worker from making or supporting a charge of discrimination. The Court therefore overrules defendant's motion on this issue.

## 2.    Causal Connection

Defendant asserts that the record evidence does not establish a causal connection between plaintiff's protected activity (the EEOC Charge) and its adverse employment actions. Defendant limits its causation challenge to plaintiff's termination.[14]  Specifically, defendant argues that plaintiff's continued performance issues and her "threatening" email to Hidaka were intervening events which broke the chain of causation between the EEOC Charge and her termination.

As the Court explained above, plaintiff must establish that her protected activity caused the adverse employment action. Thomas, 803 F.3d at 514. Plaintiff can satisfy this causation standard by showing a close temporal proximity between the protected activity and her termination. Aman v. Dillon Companies, Inc., 645 F. App'x 719, 727 (10th Cir. 2016) (temporal proximity of approximately one month can be sufficient to establish causation). The Tenth Circuit has recognized, however, that evidence of temporal proximity has "minimal probative value in a

---

[14]    Although unclear, defendant also argues that plaintiff's EEOC Charge did not cause Hidaka to issue the negative performance review because Hidaka was not aware of the Charge at the time. The record shows, however, that defendant received notice of plaintiff's Charge on November 8, 2017. The record also contains evidence that Taylor – the Vice President of HR – oversaw Hidaka's department, and the two worked closely together. A reasonable jury could find that Hidaka knew about plaintiff's EEOC Charge when she issued the negative performance review on November 10, 2017.

retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." Id. (citations omitted); Maestas v. Segura, 416 F.3d 1182, 1189 (10th Cir. 2005) (evidence of intervening events tends to undermine inference of retaliatory motive and weaken causal link).

Here, defendant concedes that plaintiff has established a sufficient temporal proximity between the EEOC Charge, of which defendant became aware on November 8, 2017, and the termination of her employment on December 20, 2017. See Downs v. Jostens, Inc., 23 F. Supp. 3d 1332, 1338 (D. Kan. 2014) (protected activity and adverse employment action occurred within six weeks of each other). Defendant argues that plaintiff's continued performance issues and her "threat" to Hidaka constitute intervening acts, however, that provided legitimate bases for termination as a matter of law.

The Court disagrees. As the Court explained above, the record evidence suggests that defendant has profoundly exaggerated plaintiff's "threat" toward Hidaka. Specifically, construing plaintiff's email in light most favorable to her, the evidence shows that plaintiff was merely putting Hidaka on notice of her hostile work environment claim, which was the subject of the entire email. In other words, the email was not a threat to Hidaka. As the Court further explained, a reasonable jury could find that defendant understood this, but used plaintiff's reference to gun violence – two months earlier – as an excuse to fire her. Accordingly, defendant has not shown that as a matter of law, this email constituted an intervening event – let alone an intervening event which justified plaintiff's termination.

The same is true with respect to plaintiff's continued performance issues. As the Court explained, defendant treated more leniently other similarly-situated employees who had comparable performance issues (King, Evans-Osborn and Klein). That is, despite performing

similarly to plaintiff, King, Evans-Osborn and Klein all received gradual discipline which included multiple warnings, specific goals for improvement and documented follow-up dates. Plaintiff, on the other hand, received one written warning before her termination nine days later. Accordingly, defendant has not shown that as a matter of law, plaintiff's performance was an "intervening event" which provided a legitimate basis for termination. A reasonable factfinder could conclude that because defendant did not react the same way to other similarly-performing employees, defendant did not actually find plaintiff's work so unsatisfactory as to warrant termination. The Court overrules defendant's motion on this issue.

### B. Legitimate, Non-Retaliatory Reasons

Defendant asserts that it is entitled to summary judgment because it had legitimate, non-retaliatory reasons for its adverse employment actions. As the Court explained above, once plaintiff establishes a prima case of retaliation, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its actions. Thomas, 803 F.3d at 514.

Here, defendant asserts that it took the adverse employment actions (negative performance review, written warning, rejecting pay increase and termination) for the same reasons that the Court addressed above with respect to discriminatory discharge: poor performance, refusal to accept constructive criticism and "threatening" Hidaka. Plaintiff does not contest that if true, these are legitimate, non-retaliatory reasons for the adverse employment actions at issue. Defendant has satisfied its burden on this issue.

### C. Pretext

Defendant asserts that it is entitled to summary judgment because its non-retaliatory reasons for taking the adverse employment actions against plaintiff were not pretextual.

As the Court explained above, once defendant proffers legitimate, non-retaliatory reasons for its adverse employment actions, plaintiff must show that those reasons were pretextual. Thomas, 803 F.3d at 514. Plaintiff can establish pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." McInerney v. United Air Lines, Inc., 463 F. App'x 709, 715 (10th Cir. 2011). Plaintiff can also show pretext by demonstrating that defendant treated plaintiff differently than other similarly-situated employees. Id. Moreover, when combined with other evidence, "temporal proximity between the protected activity and the alleged adverse employment action . . . can support a finding of pretext." Zisumbo v. Ogden Reg'l Med. Ctr., 801 F.3d 1185, 1200 (10th Cir. 2015)

Here, the record evidence creates a genuine issue of material fact whether defendant's non-retaliatory reasons for their adverse employment actions were pretextual, and that the real reason was plaintiff's EEOC charge.

### 1.    Plaintiff's Performance

A reasonable factfinder could conclude that defendant used plaintiff's performance as an excuse to take the adverse employment actions at issue. As the Court explained above, the evidence suggests that defendant did not actually find plaintiff's work unsatisfactory. Specifically, at the time of plaintiff's written warning, ten of her similarly-situated coworkers were averaging less than 160 cases per day, and four other abstractors were scoring less than 96 per cent in their audits. Unlike with plaintiff, defendant did not discipline or otherwise punish any of these employees. A reasonable factfinder could conclude based on this evidence that defendant did not find plaintiff's work unsatisfactory. If defendant did not actually find plaintiff's work

unsatisfactory, this casts doubt on whether plaintiff's performance was the real reason for the adverse employment actions.

In addition to showing that plaintiff's performance was a pretextual reason for her termination, the record also supplies enough evidence to show that her complaint of racial discrimination was the real reason. First, the record shows that similarly-performing employees who did not file discrimination charges (King, Evans-Osborn and Klein) were treated more leniently than plaintiff. That is, despite performing similarly to plaintiff, King, Evans-Osborn and Klein all received gradual discipline which included multiple warnings, specific goals for improvement and documented follow-up dates. Plaintiff, on the other hand, received one written warning before her termination nine days later.

Second, the record evidence shows that defendant took the adverse employment actions at issue soon after plaintiff's EEOC Charge. Defendant became aware of plaintiff's EEOC Charge on November 8, 2017. On November 10, Hidaka gave plaintiff a negative performance review. On November 13, plaintiff was the only employee not to receive an annual pay increase. On December 11, Hidaka, Ferris and Kraft issued plaintiff a written warning. Finally, on December 20, defendant terminated plaintiff's employment. All four of these adverse employment actions (negative performance review, rejecting pay increase, written warning and termination) occurred within six weeks of plaintiff's EEOC complaint, and two occurred within five days. Combined with the evidence that defendant did not actually find plaintiff's work unsatisfactory and that defendant applied lesser discipline to employees who did not file discrimination charges, a reasonable jury could find that her performance was a pretextual reason to take these adverse employment actions.

## 2. Constructive Criticism and Plaintiff's "Threat"

The record evidence also creates a genuine issue of material fact whether plaintiff's reaction to constructive criticism and her "threat" to Hidaka were pretextual reasons to take the actions at issue. As the Court explained above, the evidence suggests that defendant has significantly exaggerated plaintiff's conduct. With respect to the alleged "threat," the evidence shows that when plaintiff "warned" Hidaka in the email, plaintiff was putting Hidaka on notice of her hostile work environment claim, which was the subject of the email. In other words, plaintiff was not threatening Hidaka, and any reasonable factfinder could conclude that defendant understood that.

Moreover, although defendant does not identify the particular incidents in which plaintiff rejected constructive criticism, the Court assumes that it refers to those it discussed in the context of discriminatory discharge: (1) the incident on November 6, 2017 when plaintiff and her managers discussed the mistakes she was making, (2) the incident on November 10, 2017 when plaintiff and Hidaka each stated that they expected respectful and professional dialogue and (3) the incident on November 30, 2017 when plaintiff accused her managers of fabricating audit results and demanded to be treated like everyone else. As the Court explained above, this evidence does not entitle defendant to judgment as a matter of law. The November 6, 2017 encounter with Kraft ended with plaintiff acknowledging the mistake that she had been making and assuring that she would avoid the mistake in the future. In the other two incidents, plaintiff insisted that her managers reciprocate the respect that they were demanding from her and treat her the same as her coworkers. Particularly against the backdrop of the close proximity between the EEOC Charge and the adverse employment actions at issue, along with the lesser discipline for similarly-situated employees who did not file discrimination charges, a reasonable factfinder could conclude that defendant used

these incidents as pretext.  The Court therefore overrules defendant's motion on this issue.

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #56) filed October 1, 2019 is **OVERRULED.**

Dated this 25th day of March, 2020 at Kansas City, Kansas.

<div style="margin-left:40%">

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge

</div>